IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**SALETHA GORE**                                      Case No. 1:17 CV 953
**ON BEHALF OF D.G.,**

     Plaintiff,                                   Chief Judge Patricia A. Gaughan

     v.                                            Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

     Defendant.                                 REPORT AND RECOMMENDATION

### INTRODUCTION

Saletha Gore ("Ms. Gore") filed a Complaint against the Commissioner of Social Security

("Commissioner") on behalf of D.G., a minor child ("Plaintiff"), seeking judicial review of the

Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district

court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). For the reasons stated below, the

undersigned recommends the decision of the Commissioner be reversed and remanded.

### PROCEDURAL BACKGROUND

Plaintiff's grandmother filed an application for SSI on behalf of Plaintiff in January 2014,

alleging a disability onset date of February 1, 2013. (Tr. 105-10). The claims was denied initially

and upon reconsideration. (Tr. 65-67, 71-73). Plaintiff's grandmother then requested a hearing

before an administrative law judge ("ALJ"). (Tr. 74). On February 10, 2016, Plaintiff's attorney

appeared at a hearing before the ALJ. (Tr. 39). Plaintiff and her mother (Ms. Gore[1]) failed to appear

at the hearing. *Id.* Plaintiff's attorney stated Ms. Gore knew there was a hearing, but "she said she

---

1. Between the time of the application filing and the time of the hearing, Plaintiff's guardian
changed from her grandmother to her mother. (Tr. 40).

forgot that the hearing was today." (Tr. 40). The ALJ said he would issue a notice to show cause. (Tr. 44). On March 16, 2016, the ALJ found Plaintiff not disabled in a written decision. (Tr. 17-32). Therein, the ALJ also found Ms. Gore had not shown good cause for her failure to appear at the hearing. (Tr. 17).[2] The Appeals Council denied Ms. Gore's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-4); 20 C.F.R. §§ 416.1455, 416.1481. Ms. Gore then filed the instant action on behalf of Plaintiff on May 4, 2017. (Doc. 1).

## FACTUAL BACKGROUND[3]

Plaintiff as born in April, 2002, making her thirteen years old on the date of the ALJ's decision. *See* Tr. 32, 54.

School Records

In second grade (2009-10), Plaintiff received mostly As and Bs. (Tr. 217). In third and fourth grades (2010-11, 2011-12), she received grades ranging from A to D. *Id.* In fifth grade (2012-13), Plaintiff's grades were mostly Cs and Ds. *Id.* In sixth grade (2013-14), Plaintiff received mostly Bs and Cs, but failed social studies, and by seventh grade, Plaintiff was failing three classes and received grades of B through D in others. (Tr. 218).

---

2. Specifically, the ALJ explained:

> The undersigned issued a Notice to Show Cause for Failure to Appear on February 11, 2016. (Exhibit 12B). Ms. Gore responded indicating that she was "not notified" of the hearing. (Exhibit 13B). This is inconsistent with the statements of the representative, as Ms. Goodwin advised that Ms. Gore was expressly aware of the hearing per multiple conversations with her office. The undersigned cannot find good cause for failure to appear, and has issued the following decision on the available administrative record.

(Tr. 17).
3. The undersigned summarizes the portions of the record relevant to the arguments raised by Ms. Gore. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (arguments not raised in opening brief considered waived).

Records from the Cleveland Municipal School District also show repeated disciplinary actions in 2011-2014. *See* Tr. 159-80 (referral forms and suspension notices). Specifically, during the relevant time period, Plaintiff was suspended for disruptive conduct (Tr. 162, 173) (January 2013), yelling and screaming (Tr. 164) (March 2013), hitting/punching (Tr. 165) (April 2013), failing to follow school procedures (Tr. 166) (May 2013), failing to attend classes, using disruptive language, and disruption (Tr. 174) (February 2014).

Plaintiff also received numerous in- and out-of-school suspensions due to disruptive behavior at Memorial School between December 2013 and February 2014. *See* Tr. 114-34. Reasons for suspensions included primarily verbal confrontations causing disruption, as well as physical confrontations. *See id.* Other records show additional suspensions in 2015 and 2016. (Tr. 213-14) (attendance report noting 21 days of out of school suspensions from October 2015 through January 2016); (Tr. 215) (discipline incident list).

<u>Medical Records</u>

Plaintiff was referred to Bellefaire in 2012 "due to acting out at school and defiance." (Tr. 260). She was diagnosed initially with a depressive disorder (Tr. 281), with cyclothymic disorder added shortly thereafter (Tr. 284). This was later changed to bipolar II disorder. *See* Tr. 435.[4]

In January 2013, Plaintiff's grandmother reported Plaintiff's behavior was worsening despite receiving therapy, and she was ready to try medication. (Tr. 253). Plaintiff was assessed with disruptive disorder not otherwise specified, and oppositional defiant disorder. (Tr. 255).

In April 2013, Plaintiff's grandmother reported Plaintiff's behavior worsened over the prior two years. (Tr. 303). Plaintiff was reportedly disruptive at home if she did not get her way, and

---

4. In 2012, when Plaintiff was 10 years old, her weight was "estimated" by a counselor to be 90 pounds. (Tr. 277).

could be "sweet one minute and then . . . mean". *Id.* Plaintiff also fought with her peers. *Id.*
psychiatrist Jonathon Nehrer, M.D., noted he would try Plaintiff on Abilify. (Tr. 305).

At a June 2013 visit, Plaintiff's grandmother reported Plaintiff was "better", but still had
days when her behavior was "out of control". (Tr. 300).

In July 2013, Plaintiff returned to Dr. Nehrer. (Tr. 298). He noted Plaintiff's diagnoses of
bipolar disorder not otherwise specified, and mood dysregulation disorder. *Id.* He switched
Plaintiff's medication from Risperidone to Abilify "due to the weight gain", but noted her mood
was responding to the medication. *Id.* Plaintiff weighed 151.6 pounds at this appointment, which
Dr. Nehrer noted was "up 7 lbs". (Tr. 297)

At an August 2013 well-child visit, chronic problems of bipolar disorder and a high BMI
were noted. (Tr. 256). Her weight was 149 pounds at this appointment. *Id.*

In November 2013, Plaintiff's grandmother reported Plaintiff's medication was working
well. (Tr. 360). She noted Plaintiff was calmer, getting more work done at school, and receiving
awards. (Tr. 360). Plaintiff herself noted school was easier and she was enjoying school work. *Id.*
Dr. Nehrer noted Plaintiff had "much impr[]oved mood stability on abilify". (Tr. 361).

In February 2014, Plaintiff returned to Dr. Nehrer. (Tr. 357-59). Plaintiff's grandmother
reported Plaintiff was "making big improvements at school, and she has very few outbursts at
home." (Tr. 357). Plaintiff's appearance, thought content, speech, intellectual functioning, and
perceptions were unremarkable. (Tr. 357-58). She had decreased impulse control, decreased
frustration tolerance, an impaired ability to concentrate, disinhibited behavior, and a labile mood.
*Id.* Dr. Nehrer noted Plaintiff "continue[d] to have much improved mood stability on abilify". (Tr.
358). He diagnosed cyclothymia, assessed improvement, and recommended Plaintiff return in two
months. (Tr. 358-59). Plaintiff weighed 156 pounds at this appointment. (Tr. 357).

Later that month, Rebecca Doman, L.S.W., completed an annual assessment of Plaintiff (Tr. 374-76). She noted Plaintiff had partially met her goal of increasing control over impulses, reducing energy level, and stabilizing her mood. (Tr. 374). Ms. Doman noted Plaintiff had recently increased acting out, particularly in school, with more suspensions and altercations with peers. (Tr. 375). Ms. Doman recommended further therapy, medication, and Community Psychiatric Supportive Treatment Service ("CPST"). (Tr. 376).

In December 2014, Plaintiff saw Emma Bogard, LS.W., for counseling. (Tr. 506-07). Plaintiff reported she tried to irritate people on purpose "because it[']s 'funny'" or because she wanted attention. (Tr. 506). Ms. Bogard noted Plaintiff "gained awareness and insight of self in identifying that some of her 'irritating' behaviors are on purpose." (Tr. 507).

Plaintiff saw Ms. Bogard twice in January 2015, discussing frustrations and conflicts with her peers. *See* Tr. 508-11. In February 2015, Ms. Bogard noted Plaintiff "continue[d] to get into physical altercations with students but has initiated the physical altercation less." (Tr. 548). Plaintiff reported difficulty stabilizing her mood and managing her frustration, and that she would become disruptive to gain attention. *Id.* Her guardian reported she had become "less aggressive at home" and had "increased her acknowledgement to [sic] the consequences of her behavior". *Id.* That same month, Plaintiff reported having been "kicked out of class due to disruptive behavior." (Tr. 489). Plaintiff transferred to a different school "due to a teacher reporting that client pushed him". (Tr. 482). Plaintiff reported "an increase in motivation to d[o] well in school and has been able to identify how her behavior affects her academic success", but she also "had an increase in conflict in the home with relatives". *Id.* Plaintiff discussed the transfer and her feelings about it with Ms. Bogard. (Tr. 482, 512, 514).

Plaintiff returned to Dr. Nehrer in February 2015. (Tr. 464-65). He noted Plaintiff was "still getting suspended for fighting". (Tr. 464). Her grandmother reported she was "worse w/o meds but meds only help a bit". *Id.* Dr. Nehrer noted she was "mildly . . . but not majorly better" with Abilify, and that they had "tried higher doses and it did not help." *Id.* He assessed mood disorder not otherwise specified, and cyclothymia. *Id.* Plaintiff weighed 192 pounds. *Id.* He suggested Plaintiff's grandmother speak to Plaintiff's counselor at school "about any other possible school options." *Id.*

The following month, Plaintiff saw Ms. Bogard who "supported [Plaintiff] in processing the disciplinary hearing that she attended" and continued to help her process her feelings about switching schools. (Tr. 516). In April, Plaintiff discussed peer conflicts at her new school and Ms. Bogard "gently challenged [her] to identify alternative behavior that would prevent peer conflicts." (Tr. 517).

In May 2015, Plaintiff began school-based group therapy with Danielle Scarpitti, LS.W. (Tr. 397-98). Plaintiff was "distracted by peers" and "talking out". (Tr. 398). These group therapy sessions continued through the month of May. *See* Tr. 399-413. Both positive and negative comments were noted. *See* Tr. 400 ("slightly distracted" and "responsive to prompts and support"); Tr. 403 ("negative attitude" and "disrespectful to peers"); Tr. 405 ("negative attitude" and "unfocused/off task"); Tr. 407 ("responsive to prompt", "some eye contact", "talking out" and "[c]lient is making an effort to communicate and connect with others"); Tr. 409 ("difficulty ignoring" and "easily distracted"); Tr. 411 ("able to accept redirections to stay on task, ignore peer negativity, and manage frustrations appropriately" and "able to identify strengths and process about how knowing her strengths can help her follow her interests and feel good about herself.");

Tr. 413 ("attempted to ignore peers", "loud tone of voice", "responsive to redirection and support", and "[c]lient is making an effort to increase self awareness.").

In June 2015, Plaintiff reported to Dr. Nehrer that she had finished seventh grade at her new school and was "fighting less but still cannot let go of a challenge". (Tr. 467). Dr. Nehrer noted "[i]t seems the stress of the suspension in March set off a[n] eating de-compensation" and noted Plaintiff weighed 213 pounds (compared to 192 pounds in February). *Id.* He noted Plaintiff needed to "work harder on anger control" and work on exercise and portion control to control her weight. (Tr. 468). Plaintiff's grandmother stated she would walk with Plaintiff daily. (Tr. 469).

Plaintiff returned to Dr. Nehrer in July 2015. (Tr. 470-71). Plaintiff reported she had been to basketball practice at the community center, and to the water park with family. (Tr. 470). Both Plaintiff and her mother reported she had not been fighting, and Plaintiff reported she had been walking away from confrontation. *Id.* She weighed 216 pounds. *Id.*

Plaintiff had a routine physical in August 2015. (Tr. 392-96). Her only complaint was a rash on her left knee. (Tr. 392). Her "problem list" included bipolar disorder and a high BMI, both with an onset date of August 2013. *Id.* Plaintiff weighed 232 pounds, and was given advice regarding diet and exercise. (Tr. 392-95).

In October 2015, Dr. Nehrer noted Plaintiff was "less moody now" and opined it was a combination of her medication, moving in with her mother, and maturity. (Tr. 474). He noted he would change her medication due to her weight "since she is doing better." *Id.*

Also in October 2015, Plaintiff saw Rosalynne Somner, L.S.W. (Tr. 479-80). Plaintiff was living with her mother and mother's fiancé, and had previously lived with her grandmother. *Id.* Since living with her mother, she had participated in community activities, played basketball, and

was a high-stepper with her school. *Id.* Plaintiff's mother reported a "decrease in fighting, and no physical altercations" since Plaintiff came to live with her. *Id.*

Plaintiff's October 2015 individualized service plan with Bellefaire noted her presenting problem as that she "struggles with management of impulsivity and does not foresee the consequences of the behavior" and "[h]er moods are unpredictable which can cause her to act out in both emotional and ag[g]ressive manners." (Tr. 421).

Plaintiff saw Ms. Somner again the following month. (Tr. 501). They discussed Plaintiff's difficulty returning to school after a suspension, and bullying. *Id.*

Also in November, Plaintiff reported to Dr. Nehrer that her medication was helping, but she was concerned about weight gain. (Tr. 476). She was "not fighting" but not losing weight. *Id.* She weighed 230.8 pounds at this appointment. *Id.* Dr. Nehrer again instructed Plaintiff regarding portion control and exercise. (Tr. 476-77).

*Non-medical Reports*

In March 2014, Plaintiff's grandmother reported Plaintiff did some chores, but had to be monitored closely. (Tr. 157). She also reported frequent arguments between Plaintiff and her siblings, and that she would have to remove Plaintiff from the situation. *Id.* Plaintiff missed school frequently due to behavioral suspensions. *Id.*

In an April 2014 function report, Plaintiff's grandmother discussed Plaintiff's fluctuating moods. (Tr. 151) (noting she is sometimes "nice and helpful" and "the next minute, I turn around [and] she is fussing/fighting with her sisters or brothers"). She noted Plaintiff's varying moods made describing a typical day difficult. (Tr. 154).

In August 2014, Plaintiff's grandmother wrote Plaintiff made bad decisions and started arguments both at home and at school. (Tr. 203). She stated she was suspended "so many time[s]"

that her school would not allow her back. *Id.* She reported Plaintiff needed constant supervision. (Tr. 204). Specifically, she noted she had to supervise Plaintiff's taking of her medication daily. (Tr. 201).

A juvenile court order in January 2016 restored custody to Plaintiff's mother. (Tr. 112). The order noted Plaintiff had been residing with her mother since September 2015 when she "became too much for [her grandmother] to handle." (Tr. 111).

*Opinion Evidence*

In April 2014, state agency psychologist Janet Souder, Psy.D., reviewed Plaintiff's records. (Tr. 48-53). Dr. Souder noted Plaintiff did not get along with peers and made bad decisions. (Tr. 49). She opined Plaintiff had: no limitation in the domains of acquiring and using information, moving about and manipulating objects, and health and physical well-being; less than marked limitation in the domains of attending and completing tasks and caring for self; and marked limitation in interacting and relating with others. (Tr. 50-51).

In August 2014, state agency psychologist Kristen Haskins, Psy.D., reviewed Plaintiff's records. (Tr. 58-63). She noted the records showed improvements at school in February 2014, but also a suspension from school in the same month. (Tr. 59). She affirmed the evaluation of the functional domains as opined by Dr. Souder. (Tr. 59-60).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). For claimants under the age of 18, the Commissioner follows a three-step evaluation process—found at 20 C.F.R. § 416.924(a)—to determine if a claimant is disabled:

1.  Is claimant engaged in a substantial gainful activity? If so, the claimant is not disabled regardless of their medical condition. If not, the analysis proceeds.

2.  Does claimant have a medically determinable, severe impairment, or a combination of impairments that is severe? For an individual under the age of 18, an impairment is not severe if it causes a slight abnormality or a combination of slight abnormalities which causes no more than minimal functional limitations. If there is no such impairment, the claimant is not disabled. If there is, the analysis proceeds.

3.  Does the severe impairment meet, medically equal, or functionally equal the criteria of one of the listed impairments? If so, the claimant is disabled. If not, the claimant is not disabled.

To determine whether an impairment or combination of impairments functionally equals a listed impairment, the minor claimant's functioning is assessed in six different functional domains. 20 C.F.R. § 416.926a(b)(1). If the impairment results in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain of functioning, then the impairment is of listing-level severity and therefore functionally equal to the listings. *Id.* § 416.926a(a).

A "marked" limitation is one that is more than moderate but less than extreme, and interferes "seriously" with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(2)(i). "It is the equivalent of functioning [one] would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. *Id.* An "extreme" limitation is one that interferes "very seriously" with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(3)(i). The six functionality domains are: 1) acquiring and using information, 2) attending and completing tasks, 3) interacting and relating with others, 4) moving about and manipulating objects, 5) caring for yourself, and 6) health and physical well-being. *Id.* § 416.926a(b)(1). In determining functional equivalence, the ALJ must consider the "whole child." Social Security Ruling 09–lp, 2009 WL 396031, at *2.

## DISCUSSION

Ms. Gore challenges the ALJ's finding that Plaintiff had less than marked limitation in the domain of caring for self. Specifically, she contends the ALJ: 1) failed to appropriately consider Plaintiff's obesity; 2) failed to consider Plaintiff's limitations longitudinally as required by SSR 09-1p; and 3) provided conflicting rationales in his evaluation of the domains of interacting and relating, and caring for self. The Commissioner responds that the ALJ did not err, and his opinion should be affirmed. For the reasons discussed below, the undersigned finds the ALJ erred in his

11

analysis of the "caring for yourself" domain, and recommends the Commissioner's decision be reversed and remanded for further proceedings.

The "caring for yourself" domain includes "how well you maintain a healthy emotional and physical state, including how well you get your physical and emotional wants and needs met in appropriate ways; how you cope with stress and changes in your environment; and whether you take care of your own health, possessions, and living area." 20 C.F.R. § 416.926a(k); *see also* SSR 09-7p, 2009 WL 396029. The regulation provides, regarding school-aged children:

> You should be independent in most day-to-day activities (e.g., dressing yourself, bathing yourself), although you may still need to be reminded sometimes to do these routinely. You should begin to recognize that you are competent in doing some activities and that you have difficulty with others. You should be able to identify those circumstances when you feel good about yourself and when you feel bad. You should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior. You should begin to demonstrate consistent control over your behavior, and you should be able to avoid behaviors that are unsafe or otherwise not good for you. You should begin to imitate more of the behavior of adults you know.

20 C.F.R. § 416.926a(k)(2)(iv); *see also* SSR 09-7p, 2009 WL 396029, *5. It also provides, regarding adolescents:

> You should feel more independent from others and should be increasingly independent in all of your day-to-day activities. You may sometimes experience confusion in the way you feel about yourself. You should begin to notice significant changes in your body's development, and this can result in anxiety or worrying about yourself and your body. Sometimes these worries can make you feel angry or frustrated. You should begin to discover appropriate ways to express your feelings, both good and bad (e.g., keeping a diary to sort out angry feelings or listening to music to calm yourself down). You should begin to think seriously about your future plans, and what you will do when you finish school.

20 C.F.R. § 416.926a(k)(2)(v); *see also* SSR 09-7p, 2009 WL 396029, *5-6.

Examples of limited function in caring for yourself include: 1) putting inedible objects in the mouth; 2) using self-soothing activities that show developmental regression (e.g., thumbsucking, re-chewing food) or have stereotyped mannerisms (e.g., body rocking,

headbanging); 3) not dressing or bathing self appropriately for age; 4) engaging in self-injurious behavior (e.g. self-inflicted injury or refusal to take medication), or ignoring safety rules; 5) not spontaneously pursuing enjoyable activities or interests; or 6) disturbance in eating or sleeping patterns. 20 C.F.R. § 416.926a(k)(3)(i)-(vi); *see also* SSR 09-7p, 2009 WL 396029, at *6. These examples do not necessarily show a marked or extreme limitation. *See* 20 C.F.R. § 416.926a.

The relevant Social Security Ruling recognizes that "[s]ome impairments may cause limitations in both [caring for self and interacting and relating with others] domains." SSR 09-7p, 2009 WL 396029, at *4. For example:

> [A] teenage girl with depression who develops poor eating habits as a form of comfort, may also avoid friends and want to be left alone. We evaluate the limitations resulting from her depression in both the domains of "Caring for yourself" and "Interacting and relating with others." Rating the limitations caused by a child's impairment(s) in each and every domain that is affected is not "double-weighting" of either the impairment(s) or its effects. Rather, it recognizes the particular effects of the child's impairment(s) in all domains involved in the child's limited activities.

*Id.* The relevant Social Security rulings distinguish between whether a particular behavior resulting from an impairment should be considered in relation to caring for self, or interacting and relating with others. *See* SSR 09-7p, 2009 WL 396029, at *4; SSR 09-5p, 2009 WL 396026, at *4 (duplicate sections entitled "The Difference Between the Domains of 'Interacting and Relating with Others' and 'Caring for Yourself'"). "A decision about which domain is appropriate of the evaluation of a specific limitation depends on the impact of the particular behavior." *Id.*

Here, in finding Plaintiff had less than marked limitation in this domain, the ALJ explained:

> The claimant has some difficulty with anger and aggressiveness, as evidenced by her ongoing difficulties at school, but on multiple occasions, her grandmother remarked that her emotional symptoms had responded well to medication and therapy. As stated above, the claimant did not require an Individualized Education Program or other special education intervention for behavioral problems. In addition, the evidence demonstrated that she had significantly less difficulty with anger outbursts or aggressiveness in the home environment.

13

The claimant's own reports to treating sources regarding managing her anger suggest she has not experienced marked difficulties. The claimant indicated to treating sources in late 2015 that she was feeling in better control of her anger and actions. She indicated she as using coping techniques of walking away from conflict (7/24/2015, Exhibit 8F, p. 74; 10/13/2015, 8F, p. 77). The evidence certainly demonstrates some intermittent emotional issues, but these have not persisted at a "marked" level throughout the period.

Further, the claimant demonstrates age-appropriate self-care, and routinely presented with good hygiene and grooming. There is no evidence of significant sleep or appetite disturbance. The claimant routinely denied self-injurious behavior or thoughts of self-harm. The claimant does not engage in risky behavior or ignore safety rules. She spontaneously pursues a variety of enjoyable activities and interests, including cheerleading, drawing, and playing team sports. This evidence demonstrates a wide range of functioning in this area.

In making this finding, the undersigned has given great weight to the opinion of the State agency psychological consultant, who opined the claimant's impairments caused "less than marked" limitation in this area. (8/1/2014, Exhibit 3A, p. 6). The subsequent evidence demonstrates some waxing and waning of the claimant's emotional issues, but overall she continued to experience stability in her ability to regulate her emotions.

(Tr. 30-31).

Ms. Gore first contends the ALJ erred in failing to recognize her obesity in evaluating this domain. As Plaintiff points out, the ALJ stated Plaintiff had no "appetite disturbance" (Tr. 30), but a record from Plaintiff's treating psychiatrist in June 2015 states: "[i]t seems the stress of the suspension in March set off a[n] eating de-compensation" and noted Plaintiff's weight was 213 pounds (compared to 192 pounds in February). (Tr. 467).[5] This same note appears in Dr. Nehrer's treatment notes in July (Tr. 470) (weight 216 pounds); (Tr. 473) October (weight 226 pounds); and November (Tr. 476) (weight 230.8 pounds). Each time, Dr. Nehrer recommended exercise and

---

5. Ms. Gore contends that "[t]he evidence showed that as she matured, her weight went from 90 pounds when she was age 10 to 223 pounds when she was age 13[.]" (Doc. 12, at 14) (citing Tr. 277, 390). This is an accurate description of the record, however Ms. Gore cites no records prior to June 2015 in which weight gain is connected to Plaintiff's mental impairments.

portion control, using identical language. *See* Tr. 467, 470, 473, 476 ("pt and GM were told about 'STRIDE' article and pt promised to try to walk 30min a day and use portion control when she eats[.]"). Notes in October and November also indicate weight concerns. (Tr. 473) ("pt is gaining weight and mom is concerned"); (Tr. 476) ("pt says the meds helps but she is concerned about wt gain").

The Commissioner contends that Plaintiff's "recent weight gain lacks the significance that Plaintiff ascribes to it" and that her "recent struggles with stress-related weight gain was not enough to establish marked impairments in self-care." (Doc. 13, at 13). But this rationale was not offered by the ALJ. *See Williams v. Comm'r of Soc. Sec.*, 227 F. App'x 463, 464 (6th Cir. 2007) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)) (a reviewing court, in assessing the decision of an administrative agency, must judge its propriety solely by the grounds invoked by the agency). Rather, as noted above, the ALJ simply failed to recognize evidence in the record that Plaintiff's impairment may have caused a "disturbance in eating . . . patterns", one of the examples provided by the regulation. 20 C.F.R. § 416.926a(k)(3)(vi). Plaintiff's treating psychiatrist specifically mentioned an "eating de-compensation" brought on by a school suspension, which caused a 21 pound weight gain over four months. (Tr. 467). The treating psychiatrist continued to mention this "eating de-compensation" as Plaintiff gained an additional seventeen pounds over the next five months. *See* Tr. 467, 470, 473, 476. Given this evidence, taken together with the specific example applicable example provided in the relevant Social Security ruling and regulation about poor eating habits as it relates to caring for self, the undersigned recommends the Court find the ALJ erred in his analysis. And, contrary to the Commissioner's argument, it is not this Court's place to evaluate that evidence in the first instance and determine whether it demonstrates Plaintiff had (or did not have) marked limitation in this area. *See Williams*, 227 F. App'x at 464. That is not

to say Plaintiff necessarily had a marked limitation in the domain of caring for self, but rather that this evidence needed to be acknowledged and addressed in the first instance by the ALJ.

Although remand is required, and such remand may change the ALJ's "caring for self" analysis, the undersigned notes Ms. Gore's other arguments regarding the caring for self domain are less persuasive. The ALJ cited significant evidence for his conclusion that Plaintiff's ability to control her emotions did not reach the marked level. The ALJ noted some improvement in Plaintiff's mood and emotional control with medication. *See* Tr. 30; *see also* Tr. 358 ("continues to have much improved mood stability on abilify"); Tr. 464 ("mildly better with abilify . . . but not majorly better"); Tr. 474 ("less moody now, is it the meds? moving in with mom? Or maturity? probably a bit of all three"). Further, as the ALJ recognized, Plaintiff herself reported improvement in managing her anger. *See* Tr. 30; *see also* Tr. 470 ("This summer Pt has NOT been fighting !! [P]t is happy and smiling and says she is walking away when people get smart with her. [P]t said she just rolled her eyes and walked away."); Tr. 473 ("Pt has NOT been fighting at home with mom or at school !! [P]t is happy and smiling and says she is still walking away when people get smart with her."); Tr. 479 (Plaintiff "reported being able to walk away at times"). Additionally, the ALJ noted Plaintiff demonstrated age-appropriate self-care, and did not engage in risky behavior. (Tr. 30). Further, she "spontaneously pursues a variety of enjoyable activities and interests", suggesting she is less than markedly limited in this area. (Tr. 30); *see also* Tr. 470 (noting trip to water park with family, and basketball practice at the community center); Tr. 479 (reporting "playing basketball and being a high stepper for school"). The undersigned finds unpersuasive Plaintiff's additional argument that the ALJ violated SSR 09-1p in focusing on periods of improvement and ignoring times of worsening. Here, the ALJ specifically recognized that Plaintiff had some limitation in the area of emotional control, *see* Tr. 31 (noting "waxing and

16

waning of the claimant's emotional issues"). The records cited support the ALJ's conclusion that, taken as a whole, despite Plaintiff's "intermittent emotional issues", these particular issues had not "persisted at a 'marked' level throughout the period." (Tr. 30).

Finally, the undersigned also finds unpersuasive Ms. Gore's argument that it was inconsistent for the ALJ to find a marked limitation in the domain of interacting and relating to others, and (relying on the same evidence) to find less than marked limitation in caring for self. As noted above, "[a] decision about which domain is appropriate of the evaluation of a specific limitation depends on the *impact* of the particular behavior." SSR 09-7p, 2009 WL 396029, at *4 (emphasis added). Thus, it was not error for the ALJ to consider Plaintiff's "verbal anger outbursts and physical aggression, as demonstrated by multiple school suspensions throughout the period" (Tr. 27), as demonstrating a marked limitation in interacting and relating with others, but to find this same evidence did not necessarily demonstrate a marked limitation in caring for self, *see* Tr. 30, because the "impact" of the behavior cited was primarily on others. *See Hawthorne v. Colvin,* 2014 WL 2920811, *5-6 (N.D. Ohio) (adopting report and recommendation stating an ALJ did not err in evaluating a minor claimant's "aggression, bullying, fighting, and disrespectful behavior" under the domain of interacting and relating with others instead of caring for oneself"). The *Hawthorne* court explained if aggression and disrespectful behavior were evaluated under both interacting and relating with others and caring for self, "a finding of marked impairment in the area of interacting and relating with others would necessarily trigger a finding of marked limitations in the area of caring for oneself, thereby undermining the regulatory scheme" where two marked limitations equals disability. *Id.* at *6.

Therefore, the undersigned recommends the Commissioner's decision be reversed and remanded to address the evidence of Plaintiff's weight gain as it relates to the domain of caring for self. On remand, the ALJ should re-evaluate the caring for self domain as a whole, taking into consideration this previously-unmentioned evidence.[6]

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned recommends the Court find the Commissioner's decision to deny SSI not supported by substantial evidence. Accordingly, the undersigned recommends the decision of the Commissioner be reversed and remanded pursuant to sentence four of 42 U.S.C. 405(g).

IT IS SO ORDERED.

 s/James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).

---

6. In Reply, Ms. Gore also raises an argument that the ALJ "failed to consider [Plaintiff's] poor academic performance as evidence of her failure to self-regulate her emotional needs or to cope with stress". (Doc. 14, at 6). Although Ms. Gore mentioned in her opening brief Plaintiff was "perform[ing] poorly in school", *id.* at 17, and had "poor grades", she did not present a developed argument on this issue and how it related to the caring for self domain. As such, the undersigned does not address it. *See McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("[I]ssues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").